UNITED STATES DISTRICT CORUT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X
GWENDOLYN GRAY,                                                         Case No.: 08-CV-03233
                                                                                    (RS)   (THK)
               Plaintiff,

     -against-                                                **DEFENDANT WACKENHUT
                                                                         SERVICES INCORPORATED'S
                                                                         RULE 26(a) INITIAL
THE UNTIED STATES OF AMERICA,                                            DISCLOSURES**
WACKENHUT SERVICES, INCORPORATED,
ALUTIIQ SECURITY & TECHNOLOGY, LLC and
AFOGNAK NATIVE CORPORATION,,

               Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

The defendant, WACKENHUT SERVICES, INCORPORATED, by its attorneys, AHMUTY, DEMERS & McMANUS, ESQS., as and for its initial disclosure pursuant to Fed.R.Civ.P. 26(a)(1)(A), et seq., responds as follows upon information and belief:

**DISCLOSURES**

1)    The identity of all persons likely to have discoverable information (unless solely for impeachment):

- The plaintiff, Gwendolyn Gray

- The plaintiff's physicians and healthcare providers

- The plaintiff's experts retained for trial, (if any).

- Michael W. Goodwin
  Regional Manager, Northeast Region
  Wackenhut Services, Inc.
  (Address and Contact information will be provided under separate cover)

This response may be supplemented or amended as discovery progresses.

    2) <u>A general description of documents, etc., in this defendant's possession, custody or control that this defendant, may use to support its claims or defenses (unless solely for impeachment)</u>:

To the extent that this responding defendant, WACKENHUT SERVICES, INCORPORATED, is in possession of documents; copies of the following will be provided as discovery progresses:

- Various medical records/reports of the plaintiff
- Various construction contracts
- Various job records maintained regarding the secured location
- Various Contracts between WACKENHUT SERVICES, INCORPORATED and other parties to this litigation.
- An agreement between this defendant, WACKENHUT SERVICES, INCORPORATED and ALUTIIQ SECURITY & TECHNOLOGY, LLC, is attached hereto as **EXHIBIT "A."**

Additionally, this responding defendant, WACKENHUT SERVICES, INCORPORATED, through discovery, expects to receive the following documents:

- Various tax returns
- Various employment records
- Various medical records
- Various authorizations for the release of documents
- Various Photographs and videos
- Various Contracts and Agreements
- Various design documents, including but not limited to schematics, drawings and operations manuals
- Expert reports and findings
- Various insurance policies and agreements
- Various documents demonstrating that the plaintiff has complied with the Federal Torts Claims Act under <u>28 U.S.C. § 1346</u>, et seq.
- All documents and information that must be disclosed pursuant to <u>Fed.R.Civ.P. 26(a)(1)(A)</u>, et seq.

3. <u>A computation of damages</u>:

Not applicable.

4. <u>Insurance Agreements</u>:

America Home Assurance issued a policy of insurance to the defendant, WACKENHUT SERVICES, INCORPORATED, during the time periods relevant to the complained of incident with a policy limit of $5,000,000.00 per occurrence.

National Union Insurance issued an excess policy of insurance to the defendant, WACKENHUT SERVICES, INCORPORATED, during the time periods relevant to the complained of incident with a policy limit of $25,000,000.00 per occurrence.

**ADDITIONAL NOTICES**

**PLEASE TAKE NOTICE** that the undersigned hereby requests, pursuant to Fed.R.Civ.P. 26(f), that the plaintiff shall confer with all parties to establish a time and place at which a conference may be held, to establish a proposed discovery schedule.

**PLEASE TAKE FURTHER NOTICE** that these responses are continuing in nature and shall be supplemented or amended freely by this responding defendant, WACKENHUT SERVICES, INCORPORATED, as discovery progresses.

**PLEASE TAKE FUTHER NOTICE** that this defendant request that all parties serve upon this responding defendant, WACKENHUT SERVICES, INCORPORATED, all initial disclosures required pursuant to Fed.R.Civ.P. 26(a)(1)(A), et seq., as soon as practicable.

DATED:    Albertson, New York
          May 15, 2008

                BY:    FRANK J. PECORELLI, JR.(8839)
                AHMUTY, DEMERS & McMANUS, ESQS.
                Attorneys for Defendant-
                **WACKENHUT SERVICES, INCORPORATED**
                200 I.U. Willets Road
                Albertson, New York  11507
                (516) 294-5433
                File No.:   WAC 051508 FJP

TO:    FINKELSTEIN & PARTNERS, LLP
        Attorneys for Plaintiff
        436 Robinson Avenue
        Newburgh, NY 12550
        (845) 562-0203
        (845) 562-3492 (fax)

# AFFIDAVIT OF SERVICE BY MAIL

STATE OF NEW YORK)
                      ) S.S.:
COUNTY OF NASSAU )

      CHAROLETTE RUBIO being duly sworn deposes and says:  deponent is not a party to the action, is over 18 years of age and resides at West Islip, New York.

      On May 16, 2008  deponent served the within DEFENDANT WACKENHUT SERVICES INCORPORATED'S RULE 26 (a) DISCLOSURE  upon the following attorneys at their respective addresses, the addresses designated by said attorneys for that purpose, by depositing a true copy of same enclosed in a post-paid properly addressed wrapper, in an official depository under the exclusive care and custody of the United States Postal Service within the State of New York:

TO:    FINKELSTEIN & PARTNERS, LLP
         Attorneys for Plaintiff
         436 Robinson Avenue
         Newburgh, NY 12550

                                        _____
                                        CHAROLETTE RUBIO

Sworn to before me this
16th  day of May, 2008

_____
      NOTARY PUBLIC, N.Y.S.

**Index No.**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
======================================
**GWENDOLYN GRAY,**

               **Plaintiff,**

   **-against-**

**THE UNITED STATES OF AMERICA,**
**WACKENHUT SERVICES, INCORPORATED,**
**ALUTIIQ SECURITY & TECHNOLOGY, LLC and**
**AFOGNAK NATIVE CORPORATION,**

               **Defendants.**
======================================
      **DEFENDANT WACKENHUT SERVICES,**
    **INCORPORATED'S RULE 26 (a) DISCLOSURE**
======================================
    **AHMUTY, DEMERS & McMANUS, ESQS.**
        **Attorneys for Defendant**
   **WACKENHUT SERVICES, INCORPORATED**
         **200 I.U. Willets Road**
       **Albertson, New York  11507**
          **(516) 294-5433**
         **WAC 051508 FJP**
======================================

## ID/IQ TASK ORDER SUBCONTRACT

This subcontract is entered into and made effective as of August 11, 2003, between Alutiiq Security & Technology, LLC, an Alaska Limited Liability Corporation ("AS&T"), and Wackenhut Services, Inc. ("WSI"), a Florida Corporation, together referred to herein as "the parties."

## RECITALS

A.  The U.S. Army, Northern Region Contracting Center has awarded a fixed price award fee contract for guard services, Contract Number DABJ01-03-D-0014 (the "Prime Contract"), to AS&T. The Prime Contract is an Indefinite Delivery/Indefinite Quantity contract with fixed price award fee Task Orders.

B.  The Prime Contract was awarded to AS&T after AS&T and WSI's joint response to Solicitation No. DABJ01-03-R-0066-0001.

C.  The Prime Contract designates AS&T as the Contractor, with overall program and performance responsibility for Task Orders issued under the Contract ("Government Task Orders." AS&T wishes to subcontract with WSI for labor and support services to be utilized in support of Government Task Orders issued under the Prime Contract.

D.  In preparation for their joint response to the Government's Solicitation, the parties entered into a Teaming Agreement establishing their respective roles as to the solicitation, as well as preliminary guidelines for this subcontract if the Prime Contract was awarded to AS&T.

E.  The parties intend to memorialize the framework for their agreement as to the work to be performed by WSI in support of the Prime Contract and all Government Task Orders through this subcontract and the execution of individual Task Orders.

## AGREEMENT

Now therefore, in consideration of the premises and the promises set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**1.  Contract Documents**

Contract Documents consist of the Prime Contract, including all change orders, government task orders, and contract modifications; all terms, requirements, attachments, and regulations incorporated into the Prime Contract; this Agreement; and all Task Orders. In the event of a conflict between the terms of the contract documents, the following is the order of precedence: (1) Task Orders executed between the Parties; (2) this Agreement; (3) the Prime Contract, including any modifications.

Subcontractor shall mean Wackenhut Services Inc., its employees, agents, representatives, successors and assigns.

AS&T shall mean Alutiiq Security & Technology, LLC, its employees, agents, representatives, successors and assigns.

Government Task Order shall mean a written order for Work issued by the Government to AS&T under the Prime Contract.

Task Order shall mean a written order for work issued by AS&T to the Subcontractor, and accepted by the Subcontractor, in support of work called for by a Government Task Order.

Government shall mean the US Army, Northern Region Contracting Center or the United States of America.

Acceptance of work under a Task Order shall mean either express or implied agreement with the terms of the Task Order, as indicated by the signature of a representative of the Subcontractor on the Task Order documentation, initiation of the work required by the Task Order, or the acceptance of payment funds required by the Task Order.

2. **Scope of Work**

   a.   Prime Contract

AS&T is required under the Prime Contract to furnish all personnel, equipment, and supplies (except as specified in the Prime Contract for government furnished personnel, equipment, and supplies) necessary to provide security guard services within the Continental United States, Hawaii, Alaska, and the U.S. Territories. Specific projects are awarded to AS&T under the Prime Contract through the award of specific Government Task Orders.

   b.   Subcontract

This is a Fixed Price Award Fee ID/IQ subcontract entered into in support of the Prime Contract. WSI shall furnish all of the requested labor, materials, equipment, supplies, services, and other items necessary for the proper performance of Government Task Orders issued under the Prime Contract.

   c.   Task Order Response and Pricing

The parties will employ the customer approved costing model previously utilized for the 2003 Ft. Bragg Task Order for generation of all future Task Order pricing and for generation of all future Task Orders to WSI. The template for all Task Orders is attached to this Subcontract as Attachment A. Signed Task Orders between the parties become automatically incorporated into this Agreement upon execution.

3. **Relationship of Parties**

WSI, including its employees, agents and representatives, shall be deemed an independent contractor and not an agent, employee, or subsidiary of AS&T. All benefits, coverages and claims of WSI's employees shall be the sole obligation of WSI. Unless specifically authorized in writing by AS&T, WSI shall have no authority to make commitments of any kind on behalf of AS&T.

4. **Flow Down Requirements**

All terms, conditions, requirements, regulations, Federal Acquisition Regulations, personnel and performance standards, and contractual obligations of any kind imposed upon AS&T under the Prime Contract and/or Government Task Orders are equally binding on WSI for the work or services performed under this Agreement.

5. **Contract Period**

The period of performance for this Subcontract shall mirror that of the Prime Contract, subject to the termination provisions outlined in Section 12 of this Agreement.

6. **Agreement**

   a.   Personnel Requirements

It is the intent of the parties to allocate and divide the personnel requirements required by each Task Order issued under the Prime Contract in the following manner:

51%   AS&T
49%   WSI

The parties intend to use the percentage allocations described above to allocate all task order duties and responsibilities, including contract changes, modifications, and extensions. However, due to fluctuating workloads, the unique challenges presented by each new task order, and the inability to precisely divide workloads into exact percentages, the work allocated to WSI may vary, but in no case will vary by more than 4%.

   b.   Administrative Requirements

Administrative Requirements required by Government Task Orders issued under the Prime Contract will be addressed and completed by AS&T, with input and contributions from WSI as requested by AS&T.

    c.      Cost and Margin Allocation

The parties agree to meet on a quarterly basis to track, review and modify when necessary costs and margins for each Task Order to ensure compliance with the percentage allocations described in Section 6(a). Adjustments to costs, margins, and allocations under each Task Order will be made if the percentage allocation exceeds 5% in favor of either party.

    d.      Award Fee

Award fee(s), if earned and paid by the Government to the Contractor, shall be split 51%/49% between the Contractor and the Subcontractor. Accordingly, the Subcontractor shall be paid 49% of all award fee paid by the Government under the Prime Contract. Provisional award fee, if paid to the Contractor by the Government, shall be paid to the Subcontractor not later than five (5) working days after receipt by the Contractor. Payment (or adjustment) of the Subcontractor's provisional award fee to reflect the fee actually awarded for each award fee period will be made not later than five (5) working days after the Contractor receives payment (or adjustment) from the Government.

**7.    Invoicing and Payment**

The parties understand and agree that AS&T will be paid in accordance with the payment terms of the Prime Contract. Accordingly, AS&T will endeavor to pay WSI for goods and services provided and accepted under this agreement and subsequent task orders in a timely manner consistent with AS&T's receipt of payment from the Government.

In order for WSI to be paid as promptly as possible, the parties must submit billing information in a coordinated fashion. Therefore, the billing sequence for this Subcontract shall be as follows:

a.    WSI invoices, broken down by Task Order, must be received by AS&T on a semi-monthly basis no later than the fifth and the twentieth of each month.

b.    AS&T shall pay WSI within 10 working days of when AS&T receives payment from the Government, less any deductions made by the Government for improperly or untimely performed work. Payments to WSI are expressly conditioned upon the receipt of payment by AS&T from the Government. AS&T shall pay to WSI any interest penalty for untimely payments computed in accordance with the terms of the Prime Contract.

c.    WSI may be required, as a condition precedent to any payment, to furnish evidence satisfactory to AS&T that all payrolls, material bills, or other indebtedness applicable to Subcontract Work or a Task Order have been paid. In the event AS&T determines that labor, material, or other obligations incurred in the performance of the WSI's work is not being duly

paid for by WSI, AS&T may take any steps it deems reasonably necessary to assure that payments to WSI shall be utilized to pay such obligations.

WSI's invoices shall be sent to AS&T at the address referenced on the signature page of this agreement, unless specifically directed otherwise. AS&T reserves the right to verify any and all invoices. In the event that the services invoiced by WSI are deemed incomplete or deficient in any other manner, WSI may be required to submit a corrected invoice and payment by AS&T will be delayed, without interest or penalty, accordingly.

## 8. Representations and Warranties of AS&T

AS&T warrants that it has the right to enter into this Agreement and fully perform all obligations undertaken herein.

AS&T warrants the data, information and other material furnished to WSI under this Agreement does not infringe any third-party rights in any U.S. patent, copyright or trade secret.

## 9. Representations and Warranties of WSI

WSI represents that it is fully qualified to perform the scope of work and acknowledges that prior to execution of this subcontract, it has: (a) by its own independent investigation ascertained the conditions involved in performing the work and the obligations of this subcontract; and, (b) verified all information provided by AS&T or others satisfying itself as to the correctness and accuracy of that information. Any failure by WSI to independently investigate and become fully informed will not relieve WSI from its responsibilities hereunder.

WSI warrants that WSI and its employees shall, in performing Work under this Agreement, exercise the degree of skill, care and diligence consistent with the highest industry standards and perform the Work in compliance with any and all requirements identified or provided for in the Subcontract, Task Order, and Statement of Work.

WSI shall furnish competent, trained and qualified employees experienced in the type of Work to be performed. WSI is prohibited from engaging any lower tier subcontractors in the performance of Work under this subcontract.

WSI warrants that it has the right to enter into this Agreement and fully perform all obligations undertaken herein.

WSI warrants the data, information and other material furnished to AS&T under this Agreement does not infringe any third-party rights in any U.S. patent, copyright or trade secret.

## 10. Disputes; Claims

In the event of any disagreement regarding performance under or interpretation of this Agreement, and prior to the commencement of formal arbitration proceedings under Section 11, the parties shall continue performance under this Agreement and shall attempt in good faith

to reach a negotiated resolution by designating a single representative of appropriate authority to resolve the dispute. In addition, the designated representatives shall meet and confer to develop a binding timeline for the informal dispute resolution process.

In the event that the parties are unable to informally resolve a dispute, either party may invoke the arbitration procedures of Section 11 by filing a formal demand for arbitration upon the other party at the address designated in Section 20.

**11. Arbitration**

All controversies, claims, disputes and matters in question arising out of, or relating to, the Work undertaken under this Agreement, the terms of this Agreement, any Task Orders issued under this Agreement, the obligations of the parties, or the breach thereof, that cannot be resolved utilizing the disputes procedure outlined in Section 10 shall be resolved by binding arbitration in accordance with the applicable Rules of the American Arbitration Association.

The arbitration shall take place in Anchorage, Alaska, shall be governed by the laws of the State of Alaska, and the arbitrator shall apply Alaska law (without regard to conflict of law rules), except as otherwise provided by any written agreement between the parties. The award rendered by the arbitrator shall be final and judgment may be entered upon it in accordance with applicable law in any court having jurisdiction thereof, including a Federal District Court, pursuant to the Federal Arbitration Act. The arbitrator may grant either party appropriate injunctive relief, including temporary, preliminary, permanent and mandatory injunctive relief, but shall not be limited to such relief. The parties shall evenly divide the cost of the Arbitration, including the Arbitrator's professional fees.

This Arbitration Agreement shall not preclude either party from seeking injunctive relief in a court in order to protect its rights until such time as judgment is entered upon an arbitration award, nor shall the filing of such an action constitute waiver by the Company of its right to seek arbitration hereunder.

**12. Termination or Suspension**

  a. <u>Termination for Default</u> In the event that WSI materially or repeatedly defaults in the performance of any of its duties or obligations set forth in this Subcontract, or in any Task Order, and such default is not substantially cured within ten (10) days after written notice is given to WSI specifying the default, then AS&T may, by giving additional written notice, terminate this Subcontract, Work under this Subcontract in whole or in part, or the Task Order relating to the default as of the date specified in the notice of termination.

  b. <u>Automatic Termination</u> This Agreement shall terminate automatically, without penalty, upon any of the following events:

    1) the cancellation, rescission, expiration, or termination of the Prime Contract for any reason;

    2)    the filing of a petition for Chapter 7 bankruptcy protection by either party, or either party's assignment for the benefit of creditors;

    3)    the Government directs AS&T to have all Task Order subcontracted work performed by an entity other than WSI;

    4)    the suspension, debarment, or criminal investigation of WSI;

    5)    a change in WSI's legal status due to merger or sale.

    c.    <u>Rights Upon Termination</u>    Unless specifically terminated as set forth in this Section, all Government Task Orders and/or Task Orders that require performance or extend beyond the term of this Subcontract shall, at AS&T's option, be so performed and extended and shall continue to be subject to the terms and conditions of this Subcontract. WSI's obligations under this subcontract relating to warranty, confidentiality, insurance, and indemnification shall survive termination.

### 13. Non Solicitation

During the term of this Agreement, neither Party shall solicit for employment employees of the other Party who have been directly involved in the Work covered by this Agreement, unless: (1) the Party has given its written consent; (2) the employee has voluntarily terminated from the Party more than six (6) months previously; or (3) notice of termination has been given to the employee by the Party and the termination was not mandated by the Government.

### 14. Force Majeure

Time is of the essence in WSI's performance of Work under this Agreement. WSI shall not be considered in default in the performance of its obligations hereunder to the extent such performance is delayed by causes outside its control and not reasonably foreseeable of, if foreseeable, which cannot be avoided by the exercise of all reasonable efforts, including acts of civil or military authority, acts of God, acts of war, terrorism, riot, insurrection, blockages, embargoes, or sabotage. WSI notify AS&T immediately in writing of the nature, cause, date of commencement, anticipated duration of any such delay and any other effects on Subcontractor's performance in order for the protections afforded by this section to apply.

### 15. Compliance

AS&T and WSI shall fully comply with all federal, state and local laws, ordinances, statutes, rules, regulations, license and permit conditions or requirements (collectively "Laws,") including but not limited to laws pertaining to employment, health and safety, and any and all laws applicable to performance of this subcontract or work required by a Government Task Order or Task Order.

## 16. Insurance

During the term of this subcontract, WSI shall maintain insurance coverage in an equivalent form and amount as that required of AS&T under the Prime Contract.

Within three (3) days following the execution of this Subcontract, WSI shall furnish to AS&T an acceptable Certificate of Insurance evidencing compliance with these insurance requirements and showing AS&T as an additional insured. WSI is required to provide 30-days written notice of any change or cancellation of its insurance coverage

## 17. Indemnification

Alutiiq and WSI (in such capacity an "Indemnifying Party") will defend, indemnify, and hold harmless the other party, its affiliates and their respective shareholders, partners, members, directors, managers, officers, employees and other agents (each an "Indemnified Party") from and against all actions, causes of actions, liabilities, claims, suits, judgments, liens, awards, damages and other costs of any kind and nature whatsoever (individually and collectively "Claims"), whether for property damages, personal injury or death (including without limitation, claims brought by and liabilities to employees of the party or any subcontractor and expenses, costs of litigation, and reasonable attorney's fees related thereto or incident to establishing the right to indemnification) to the extent such Claims arise from any negligent act or omission or willful misconduct of the Indemnifying Party or its agents or subcontractors (or their employees or other agents) with respect to the privileges, rights, duties, obligations and responsibilities of the Indemnifying Party under, or otherwise in connection with any of the transactions contemplated in, this Agreement.

## 18. Limitation of Liability

Neither party shall be liable to the other pursuant to any agreement for any amounts representing loss of profits, loss of business, or indirect, consequential, exemplary or punitive damages of the other party. The foregoing shall not limit the indemnification, defense or hold harmless obligations set forth in this Subcontract.

## 19. Confidentiality; Proprietary Information

During the term of this Subcontract, it may be necessary for either party to disclose proprietary information to the other. Such data must be in writing and clearly identified as proprietary information or marked with a notice stating restrictions as to its use. With respect to such information, the following provisions shall apply:

    a. Each party agrees not to disclose the other's proprietary information to unauthorized parties. However, neither party shall be liable for the inadvertent or accidental disclosure of such information if a disclosure occurs despite the exercise of the same precautions as the party normally takes to safeguard its own proprietary information.

b.   Neither party shall use the other party's proprietary information for purpose other than as is required for the performance of this Subcontract. However, AS&T may, without liability, disclose to the Customer information received from WSI that is necessary for Contract or Task Order preparation, evaluation, and negotiation. If any information is marked proprietary, or bears a restrictive notice, such marking or restrictive notice will be retained on any disclosed information.

c.   The receiving party assumes no responsibility for release of proprietary information by the U.S. Government to the general public pursuant to the Freedom of Information Act or any similar regulation.

d.   Proprietary information or data marked with a restrictive notice shall be delivered, properly identified as such, only to the following individuals authorized to receive such data:

For AS&T: Ron Hancock, or his designated representative.

For WSI: Larry Luper, or his designated representative.

e.   A party's obligations regarding the use of proprietary information is not applicable when such information:

   i.   becomes available to the receiving party through third parties or the general public without restriction;

   ii.  becomes known to the receiving party independently of the disclosing party;

   iii. is independently developed by the receiving party;

   iv.  has been furnished by the disclosing party to the government with "unlimited rights";

   v.   becomes known to a party by inspection or analysis or products(s) offered for sale.

f.   Proprietary information furnished hereunder shall remain the property of the furnishing party and shall be returned to it promptly upon request. Neither this Agreement nor the furnishing of any information hereunder by either party to the other shall be construed as granting a license under any invention, patent, trademark, or copyright to manufacture, use, or sell product/data of the disclosing party.

If no proprietary information or data is identified or marked with a restrictive notice, the receiving party may assume that all information and data is furnished with unlimited rights.

g.  The obligations of the parties under this "Proprietary Information" provision shall not terminate at the expiration or upon termination of this Agreement.

**20.  Notices**

All notices or communication hereunder shall be in writing and shall be deemed to be duly given if sent by registered mail, return receipt requested, express courier, e-mail or facsimile transmission, as follows:

If to AS&T:

Alutiiq Security & Technology
737 Volvo Parkway, Suite 120
Chesapeake, VA  23320
Attn:   Ron Hancock
Facsimile: (757) 549-6454
E-Mail: RHancock@alutiiq.com

If to WSI:

Wackenhut Services Incorporated
7121 Fairway Dr, Suite 301
Palm Beach Gardens, FL 33418
Attn: Larry Luper
Facsimile: (561) 472-3641
E-Mail: lluper@wsihq.com

or, for either party, at such other address as any of the above may have furnished to the party in writing by registered mail, return receipt requested, express courier, or by e-mail or facsimile transmission, with a confirmation sent by registered mail, return receipt requested, and any such notice or communication given in the manner specified in this Section 3 shall be deemed to have been effectively given (a) three days after deposit with the U.S. Postal Service, postage prepaid, registered or certified mail with return receipt requested, (b) one business day after deposit with a reputable express courier, prepaid for overnight delivery, (c) upon confirmation of receipt by e-mail by the party to be notified, or (d) upon confirmation of receipt by fax by the party to be notified.

**21.  Waiver**

The provisions of this Agreement may be waived, altered, amended or supplemented, in whole or in part, only by a writing signed by each of the parties hereto.  Failure by either party to insist upon observance or performance of the other of all terms, conditions and requirements of this Subcontract shall not be deemed a waiver of any right to require further performance of any such term, condition or requirement.

**22.   Assignment; Binding Effect.**

Neither this Agreement nor any right or interest hereunder may be assigned in whole or in part by any party without the prior written consent of either party. This Agreement will be binding upon the parties hereto and their respective successors and permitted assignees.

**23.   Governing Law**

This Agreement, including, without limitation, the interpretation, construction, validity and enforceability hereof, shall be governed by the internal laws of the State of Alaska, without regard to the principles of conflict of laws thereof.

**24.   Headings, Gender, etc.**

The headings used in this Agreement have been inserted for convenience and do not constitute matter to be construed or interpreted in connection with this Agreement. Unless the context of this Agreement otherwise requires, (a) words of any gender will be deemed to include each other gender, (b) words using the singular or plural number also will include the plural or the singular number, respectively, (c) the terms "hereof," "herein," "hereunder," "hereto," and "Section" will refer to the specified section of this Agreement, and (e) the conjunction "or" will denote any one or more, or any combination or all, of the specified items or matters involved in the applicable list.

**25.   Invalid Provisions.**

If any provision of this Agreement is held to be illegal, invalid, or unenforceable under any present or future law, and if the rights or obligations of any party hereto under this Agreement will not be materially and adversely affected thereby, (a) such provision will be fully severable, (b) this Agreement will be construed and enforced as if such illegal, invalid, or unenforceable provision had never compromised a party hereof, (c) the remaining provisions of this Agreement will remain in full force and effect and will not be affected by the illegal, invalid, or unenforceable provision or by its severance herefrom, and (d) in lieu of such illegal, invalid, or unenforceable provision there will be added automatically as part of this Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

**26.   Counterparts**

This Agreement may be executed, including by facsimile, simultaneously in or more counterparts, each of which will be deemed an original, but all of which together will constitute one and the same instrument.

**[SIGNATURES CONTAINED ON NEXT PAGE]**

IN WITNESS WHEREOF, the parties hereto have executed this Subcontracting Agreement as of the date first written above.

AS&T                    Alutiiq Security & Technology, LLC

By: *Ronald C. Hancock*

Its: CEO

Printed Name: Ronald C. Hancock
Address: 737 Volvo Parkway, STE 120
Chesapeake, VA. 23320
Facsimile: 757-549-6454


WSI                     Wackenhut Services, Inc.

By: *Larry K Luper*

Its:        Vice President
            Business Management

Printed Name: Larry K. Luper
Address:     7121 Fairway Drive
             Suite 301
             Palm Beach Gardens, FL 33418
Facsimile:   (561) 472-3641